**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0217n.06
Filed: March 23, 2009

**No. 07-4430**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RON BENIT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| MERCEDES-BENZ USA, LLC, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: KEITH, SUTTON, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Ron Benit sued defendant Mercedes-Benz USA, LLC, under Ohio's Lemon Law, alleging that his $116,000 Mercedes S55 AMG was a "lemon." A jury found in favor of Mercedes. Benit appeals the district court's exclusion of evidence of certain repairs made to his car, rulings regarding witness testimony, partial grant of Mercedes's motion for judgment as a matter of law, and a jury instruction. Because all alleged errors (if in fact they were errors) were harmless in that no reasonable jury could have found that Benit's vehicle was a lemon, we affirm.

I.

In June 2000, Benit paid $116,226.44 for a 2001 Mercedes-Benz S55 AMG from Crown Motor Company, Inc., an authorized Mercedes dealership, in Dublin, Ohio. The following April,

he took possession of the car, which was equipped with the latest technology, including a voice recognition system, Doppler-based "Distronic" cruise control system that automatically maintained a uniform distance between the Mercedes and the car in front, "Parktronic" system that assisted the driver in operating the vehicle without hitting objects, rear bumper laser, hands-free integrated cell phone, automatic head rests, and rear-reclining, heated seats. But for Benit, this "crème de la crème" of automobiles left much to be desired.

Benit alleges that shortly after possessing his Mercedes, he discovered several defects and nonconformities that substantially impaired its use and value. He brought the vehicle to Crown on numerous occasions to repair the problems under its four-year, 50,000-mile limited warranty. Benit contends that after a reasonable number of repair attempts, Crown was unable to correct the nonconformities.

On March 30, 2006, Benit filed suit against Mercedes in the Franklin County, Ohio, Court of Common Pleas, asserting two claims for breach of warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and one claim under the Ohio Motor Vehicles with Warranty Nonconformities Act, OHIO REV. CODE ANN. § 1345.71, *et seq.* ("Lemon Law"). The case was removed to federal district court on the basis of diversity jurisdiction, and Benit voluntarily dismissed his Warranty Act claims, leaving his Lemon Law claim as the sole remaining cause of action.

The case was tried by jury beginning September 24, 2007. On October 3, 2007, the jury returned a verdict in favor of Mercedes.

Benit timely appeals.

II.

Ohio's Lemon Law provides:

> If a new motor vehicle does not conform to any applicable express warranty and the consumer reports the nonconformity to the manufacturer, its agent, or its authorized dealer during the period of one year following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier, the manufacturer, its agent, or its authorized dealer shall make any repairs as are necessary to conform the vehicle to such express warranty, notwithstanding the fact that the repairs are made after the expiration of the appropriate time period.

OHIO REV. CODE ANN. § 1345.72(A). The statute defines a "nonconformity" as "any defect or condition that substantially impairs the use, value, or safety of a motor vehicle to the consumer and does not conform to the express warranty of the manufacturer or distributor." § 1345.71(E). The Lemon Law sets forth the consequences for failing to comply with its provisions:

> If the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of repair attempts, the manufacturer, at the consumer's option . . . either shall replace the motor vehicle with a new motor vehicle acceptable to the consumer or shall accept return of the vehicle from the consumer and refund . . . [t]he full purchase price . . . [and] [a]ll incidental damages . . . .

§ 1345.72(B). In explaining "reasonable number of repair attempts," the statute provides:

> It shall be presumed that a reasonable number of attempts have been undertaken by the manufacturer, its dealer, or its authorized agent to conform a motor vehicle to any applicable express warranty if, during the period of one year following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier, any of the following apply:
>
> (A)     Substantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs;

(B)     The vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days;

(C)     There have been eight or more attempts to repair any nonconformity;

(D)     There has been at least one attempt to repair a nonconformity that results in a condition that is likely to cause death or serious bodily injury if the vehicle is driven, and the nonconformity either continues to exist or recurs.

§ 1345.73.

The Supreme Court of Ohio has characterized Ohio's Lemon Law as a "consumer-protection law" that is "designed to protect consumers from chronically defective new automobiles." *Royster v. Toyota Motor Sales, U.S.A.*, 750 N .E.2d 531, 533, 535 (Ohio 2001). "The vehicle's problem must 'substantially impai[r] the use, safety, or value of the motor vehicle to the consumer.'" *Id*. at 535 (quoting § 1345.71(E)). In other words, there must be a "major defect." *Royster*, 750 N.E.2d at 535.

Consistent with the statute's protective purpose, Ohio's courts have rejected consumers' attempts to exploit the Lemon Law for idiosyncratic or bad faith motives. The Supreme Court of Ohio has stated that the statute is not a remedy "for buyers who have soured on their new vehicle for cosmetic or other trivial reasons." *Royster*, 750 N.E.2d at 535. Similarly, Ohio's appellate courts have held that, as a matter of law, "nonconformities" do not include "intermittent groaning, grinding noise[s]," "vibrations," or other complaints that did not affect the "engine, drive train, or mechanical functioning" of the automobile, *Miller v. DaimlerChrysler Motors Corp.*, No. 78300, 2001 Ohio App. LEXIS 2450, at \*10 (Ohio Ct. App. May 31, 2001) (unpublished); a "warning light problem" that "posed no threat to . . . the driveability" or "safety" of the vehicle, *LaBonte v. Ford Motor Co.*,

No. 74855, 1999 Ohio App. LEXIS 4795, at *13-*15 (Ohio Ct. App. Oct. 7, 1999) (unpublished); a consumer's "subjective 'shaken faith' in the car," *Stepp v. Chrysler Corp.*, No. 95CA000052, 1996 Ohio App. LEXIS 6026, at *3-*4 (Ohio Ct. App. Nov. 7, 1996) (unpublished); "noise" that was "an inherent condition of the vehicle" and which did not cause the vehicle "to fail," *id.* at *4; alleged problems that were actually "normal performance characteristics of a vehicle," *Kleinman v. Chrysler Motor Corp.*, No. 94 CA 2234, 1995 Ohio App. LEXIS 2321, at *14 (Ohio Ct. App. May 26, 1995) (unpublished); a "lag" in a vehicle's transmission that could not be corrected because it "was really the normal shift pattern of that particular vehicle" and it "was performing as designed," *Hill v. Toyota Motors Sales, U.S.A., Inc.*, No. CA 14465, 1995 Ohio App. LEXIS 471, at *7 (Ohio Ct. App. Feb. 10, 1995); and "'fit and finish' adjustments to parts such as moldings, windows, bumpers and headlights," *Gen. Motors Acceptance Corp. v. Hollanshead*, 663 N.E.2d 663, 666 (Ohio Ct. App. 1995).

III.

In his appeal, Benit challenges the district court's exclusion of evidence of certain repairs made to his car, rulings regarding witness testimony, partial grant of Mercedes's motion for judgment as a matter of law, and a jury instruction.

Regarding the evidence, Benit complains that the district court erroneously excluded evidence of continuing repair work to the command unit, which controlled the vehicle's electronic accessories (voice activation system, CD player, radio, phone, navigation system, and amplifier), and the ABC suspension system, which raised and lowered the car. He contends that the district court

mischaracterized the command unit accessories as separate defective parts rather than as "manifestations or symptoms of one single specific defect." In making that error, Benit argues that the district court unjustly precluded him from presenting evidence about all repairs related to the command unit, including repairs made to accessories that first malfunctioned after the one-year/18,000-mile presumptive period in § 1345.73. As to the ABC system, Benit asserts that because he reported a problem with the system during the presumptive period (even though Mercedes was unable to duplicate it), the district court erred in excluding evidence of all later attempted repairs to it.

Concerning witness testimony, Benit contends that the district court erred by not permitting him to examine Mercedes's expert witness during his case-in-chief. He also complains that the district court improperly allowed lay witnesses to give expert opinion testimony, including prejudicial testimony that the car's transmission problems were caused by "driver error."

Regarding the district court's partial grant of Mercedes's motion for judgment as a matter of law under § 1345.73(C), Benit asserts that the court erred in ruling that there were less than the required eight attempts to repair any nonconformity.[1] He also contends that the district court erred by making inconsistent rulings, treating the command unit and phone as separate defects under § 1345.72(A) but as a single defect under § 1345.73(C).

---

[1]The district court denied Mercedes's motion for judgment as a matter of law under § 1345.73(A), which allows the consumer to prove that "[s]ubstantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs."

Finally, Benit argues that the district court incorrectly instructed the jury, over his objection, that his vehicle's "value" under § 1345.71(E) was its fair market value. He urges us to adopt a subjective interpretation of "value" and contends that the jury might have found in his favor had it been so instructed.

IV.

Although Benit invites us to assess the merits of each issue he raises on appeal, we decline to do so. Giving him the benefit of the doubt and assuming, without deciding, that the alleged errors were made, we conclude that no reasonable juror could have found that plaintiff's $116,000 Mercedes was a lemon.

The jury heard the following:

Benit enjoyed luxury. At the time of trial, he owned a Jaguar, which he kept in his basement, a Mercedes 380 SEL, and a Porsche Boxter. He also drove a BMW from the used car dealership that he bought in 2004. Prior to purchasing the Mercedes S55 that is the subject of his Lemon Law claim, Benit owned a Mercedes S500 that he also purchased from Crown. Crown bought back his S500 within six or seven months of its purchase because the vehicle allegedly required many repairs. Apparently undeterred by the alleged defects in his S500, Benit bought the S55.

The car was safe. Benit testified that he had no concerns about the safety of his S55. Accordingly, the only relevant issue for the jury was whether the "use" or "value" of his car was "substantially" impaired. § 1345.71(E).

Benit used the vehicle extensively. At the end of the car's first year – the critical Lemon Law period – Benit had driven it for 17,000 miles.[2] He conceded that this mileage was "a little higher" than the average 15,000 miles per year. In fact, he acknowledged that a consumer of a leased vehicle is permitted to drive the leased automobile for a maximum of 12,000 to 15,000 miles per year without incurring additional costs. Benit drove his Mercedes for work and pleasure, even making round-trips between his home in suburban Columbus, Ohio, and Chicago, Indianapolis, Cleveland, and New York City, cities that are hundreds of miles away. When the four-year warranty period expired, the car had 50,000 miles on it. At trial, the odometer registered approximately 53,000 miles.

The car was not defective. Benit's expert witness, William Betzler, examined the Mercedes at 52,000 miles on June 5, 2006, and testified that it was "operable," had no performance problems, and its engine and "handling and driving characteristics" were "fine." In fact, the *only* "problem" with the vehicle at that time was a "shudder" within the first ten feet of take-off, but after ten feet, the car "smoothed right out and kept on going normally." The shudder could be corrected by "accelerat[ing] lightly . . . rather than trying to do a rapid acceleration . . . ."

Most of Benit's concerns were idiosyncratic. He described himself at trial in the following manner: "[I]f I go to the grocery store, I am the guy that's parked all of the way out by the street. And I make sure that nobody is around my car." Benit's trial attorneys highlighted their client's

---

[2]The parties agree that for purposes of § 1345.72(A), the one-year period expired before the car accumulated 18,000 miles.

unique passion for automobiles, overwhelming the jury with every minor complaint Benit made over the four-year warranty period. And the complaints were numerous. They included, but were not limited to: "condensation in [the] headlamps"; noisy wipers; "whining" noises; "clunk[ing]" noises; "hum in steering"; "rattl[ing] sound" in the dash area; "clicking" driver's seat; "high frequency buzzing" and "electronic squeal" when stepping on the brakes; vibrations; low tire pressure; worn tires; uneven tire wear; failure of headlights to adjust automatically; "pinched" body harness on the phone; cracked trim; side mirror operating slowly; trim on rear seat coming off; and loose "rear window shade rod."

Mercedes responded to Benit's complaints. Time and again, Benit conceded at trial that defendant made the necessary repairs to his automobile under the vehicle's warranty. Many repairs were not covered by warranty but were "gestures of goodwill," in which Mercedes expended tens of thousands of dollars in its attempt to satisfy Benit. During the four-year warranty period, the only payments required of Benit personally were those to replace his windshield wipers, balance his tires, and upgrade his telephone. Although Benit testified that he was "dissatisfied" with Crown's service, he conceded that he made no attempt to take his vehicle to either of the two other authorized Mercedes dealerships that were within four or five miles of his office. On May 10, 2005, more than four years after Benit received the car, Mercedes decided that "enough was enough" and instructed Crown to disallow any "further goodwill repairs."

Benit wanted his money back. In his demand letter, Benit did not invite defendant to fix his car; rather, he demanded that it buy back his car, placing in capital letters the word "REFUND."

After almost *five years* of using the car and taking advantage of its warranty and defendant's goodwill, Benit sued Mercedes just before the five-year statute of limitations deadline for bringing a Lemon Law claim, § 1345.75(C), expired. When the trial judge asked why he ultimately stopped using the car, Benit did not respond that he could not use the vehicle or that its value was substantially impaired; rather, he stated: "I was determined to get my money back."

The Ohio General Assembly did not intend its consumer-protection law to be exploited in this manner. While the Lemon Law does not discriminate between buyers of luxury automobiles and those who purchase run-of-the mill vehicles, protecting both equally, it *does* require that a consumer seeking its protections demonstrate substantial impairment to the vehicle within the first year or 18,000 miles that the dealer is unwilling or unable to fix. In this case, none of those requirements were met. To the contrary, plaintiff drove the car for almost five years, registered above-average miles on it during its critical first year, put 53,000 miles on it by the time of trial, and took full advantage of the warranty and defendant's goodwill. His own expert witness merely confirmed that this $116,000 Mercedes was no lemon. At best, this was a case of "buyer's remorse" for which Ohio's Lemon Law provides no remedy. *Royster*, 750 N.E.2d at 535.

V.

Because all alleged errors, if in fact they were errors, were harmless in that no reasonable jury could have found that plaintiff's vehicle was a lemon, we affirm.